```
 1              SUPERIOR COURT OF NEW JERSEY
                CHANCERY DIVISION SOMERSET COUNTY
 2              DOCKET NO. F 031434-13

 3              Civil Action
    --------------------------------x
 4  WELLS FARGO BANK, N.A.

 5              Plaintiff,

 6              vs.

 7  CAROL A. FIORILLI, ET AL,

 8
                Defendants.
 9  --------------------------------x
    CAROL A. FIORILLI,
10
                Counterclaimant,
11
                vs.
12
    WELLS FARGO BANK, N.A.,
13

14              Counter Defendant.
    --------------------------------x
15

16              DEPOSITION OF MICHAEL DOLAN
                  THURSDAY, MAY 29, 2014
17

18

19

20

21

22

23

24

25
```

1          T R A N S C R I P T of the deposition in the
above-entitled matter by and before
2    GERALDINE ADINOLFI, a Certified Court Reporter,
License Number 30XI00228000 and Notary Public of the
3    State of New Jersey, Notary Number 2273630, held at
the offices of ANDY WINCHELL, ESQ. 45 River Road
4    Summit, New Jersey, on May 29, 2014, commencing at
9:58 in the morning.

5

6

7

A P P E A R A N C E S:
8

9

        LAW OFFICE OF ANDY WINCHELL, PC.
10      BY:  ANDY WINCHELL, ESQ.
        45 River Road, Suite 3
11      Summit, New Jersey 07901
        Attorneys for Fiorilli
12

13      REED SMITH, LLP.
        BY:  DEEPA J. ZAVATSKY, ESQ.
14      Princeton Forrestal Village
        136 Main Street, Suite 250
15      Princeton, New Jersey  08540
        Attorneys for Wells Fargo Bank N.A.
16

17      WELLS FARGO BANK, N.A.
        BY: BRIAN O'LAUGHLIN, ESQ.
18      4101 Wiseman Boulevard
        San Antonio, Texas 78251
19

20

21

22

23

24

25

```
 1                    I N D E X

 2

 3  WITNESS         DIRECT   CROSS   REDIRECT   RECROSS

 4

 5  MICHAEL DOLAN

 6  BY: MR. WINCHELL   4

 7

 8

 9

10                  E X H I B I T S

11  EXHIBIT            DESCRIPTION            PAGE

12  1            Fixed Rate Mortgage Notice     9

13  2            Plaintiff's Interrogatories   11

14  3            Case Documents                23

15  4            Data Sheet                    24

16  5            Loan Transaction Sheet        28

17  6            Production Request            55

18  7            Certification

19  8            Foreclosure Attorney Procedure 65

20               Manual VI                     67

21

22

23

24

25  *Exhibits retained by counsel.
```

```
 1          M I C H A E L   D O L A N, first having been
 2  duly sworn testified as follows:
 3  DIRECT EXAMINATION BY MR. WINCHELL:
 4          Q.      Good morning, Mr. Dolan.  My name is
 5  Andy Winchell.  We just met a minute ago, as you
 6  probably know, I represent the defendants in this
 7  action.
 8                  Could you state and spell your name
 9  for the record, please?
10          A.      Michael Dolan, M-I-C-H-A-E-L, D as in
11  delta, O-L-A-N.
12          Q.      Can you give a business address,
13  please?
14          A.      My address is 4101 Wiseman Boulevard
15  San Antonio, Texas 78251.
16          Q.      Have you been deposed before?
17          A.      Yes, I have.
18          Q.      Approximately how many times?
19          A.      Well, over 100.
20          Q.      So you know that we need an audible
21  answer, when I ask you a question?
22          A.      Yes, sir.
23          Q.      And you understand that to make life
24  easier for the court reporter, it's best if you wait
25  for the end of my question before you start your
```

```
 1   answer; you understand that?
 2        A.      Yes, sir.
 3        Q.      You don't need to call me sir, you
 4   can call me Andy.
 5        A.      I call everybody sir or ma'am.
 6        Q.      Just a habit, understood.
 7                You understand you are under oath and
 8   your testimony today would have the same force and
 9   effect as if we were in a courtroom?
10        A.      Yes, sir.
11        Q.      If you don't understand a question
12   let me know; do you understand that?
13        A.      Yes.
14        Q.      If you need a break, let us know.  We
15   just ask that it not happen while a question is
16   pending, so we wait until the end of your answer and
17   then us know and we will take a break.
18        A.      That's fine.
19        Q.      Is there any reason you cannot give
20   truthful testimony today?
21        A.      There's no reason.
22        Q.      You are not under the effect of
23   medications or drugs or anything that might impair
24   your ability to give testimony?
25        A.      I am under nothing that would impair
```

```
 1  my ability.
 2       Q.      Welcome to New Jersey on this fine
 3  spring morning, glad you were able to make this
 4  happen.
 5              Okay, and I understand correctly that
 6  you work for Wells Fargo?
 7       A.      That's correct, yes.
 8       Q.      What is the highest level of
 9  education you have attained?
10       A.      I have a Bachelors Degree in
11  accounting.
12       Q.      And from what institution?
13       A.      The University of Colorado.
14       Q.      What year is that?
15       A.      1981.
16       Q.      And did you start working immediately
17  after your graduation?
18       A.      I was working before graduation.
19       Q.      Where were you working before
20  graduation?
21       A.      Beginning in 1979 I was working at a
22  savings and loan called Majestic Savings in Denver,
23  Colorado.  I worked there until 1981.  And from 1981
24  until 1984 I worked at a savings and loan called
25  Silverado Savings, also in Denver, Colorado.  In
```

**Professional Court Reporting & Video**
**866.357.1796**

1    October of 1984 I moved to California and began

2    working at World Savings, who was the lender of this

3    loan.

4          Q.      And you worked at World Savings from

5    1984 until what time?

6          A.      Until 2007 and from September of '07

7    to September of '09.  I had a two year sabbatical.

8    September of '09 I came back to work at World and by

9    that time it had been renamed Wachovia Mortgage

10   Federal Savings Bank.  From September '09 to January

11   1 of 2010, I was at Wachovia Mortgage FSB.

12                 January 1, 2010 they were acquired by

13   Wells Fargo Bank NA and that is why I work at Wells

14   Fargo Bank NA today.

15         Q.      How many times have you appeared in

16   court to provide testimony?

17         A.      Including foreclosure trials, well

18   over 100.

19         Q.      In the past year roughly how many

20   times?

21         A.      At least 50.

22         Q.      How often have you signed

23   certification declarations or affidavits?

24         A.      I average two to three a week.

25         Q.      So if we had to extrapolate that is

```
 1   100 or 200 a year?
 2         A.        150 a year.
 3         Q.        And did you do anything in
 4   preparation for your testimony this morning?
 5         A.        I have discussed the notice of
 6   deposition with my attorney and I reviewed the
 7   payment history.
 8         Q.        You reviewed the payment history, did
 9   you review anything else?
10         A.        No.  The loan transfer history but
11   that was part of what was -- it's part of the
12   payment history.
13         Q.        Okay.  This is going to be Exhibit 1.
14                   MS. ZAVATSKY:  Prior to questioning,
15   can I put my sort of my objection to the questioning
16   on the record, so I don't have to object to every
17   question just to have --
18                   MR. WINCHELL:  Sure.  No problem.
19                   MS. ZAVATSKY:  On February 14, the
20   Honorable Judge Miller entered an order granting in
21   part the plaintiff's motion to strike.  As a result
22   of that decision, the only remaining claims in this
23   matter relate exclusively to the application of the
24   defendants' past payments to the loan.
25                   The notice of deposition requests
```

```
 1   testimony regarding the ownership and investors on
 2   the loan and it's plaintiff's position that those
 3   topics are irrelevant and not reasonably calculated
 4   to lead to discovery of admissible evidence.
 5                    I am interposing that as a general
 6   objection to anything in that line of questioning.
 7   We will refer to that as a standard objection when
 8   going forward.
 9                    MR. WINCHELL:  So we can stipulate
10   that you have made that objection with respect to
11   every question being asked in this deposition.
12                    MS. ZAVATSKY:  That's correct.
13                    MR. WINCHELL:  Fine.
14                    My understanding is we are still
15   going to ask the questions and get answers to the
16   questions, but the objection is pending.
17                    MS. ZAVATSKY:  The objection is
18   pending.
19                    MR. WINCHELL:  Understood.
20                    (Whereupon Exhibit-1 was received and
21   marked for identification.)
22        Q.        Okay.  Mr. Dolan, have you seen this
23   document before?
24        A.        I have seen these documents a while
25   back.  There are two documents in Exhibit 1.  It's
```

**Professional Court Reporting & Video**
**866.357.1796**

1  comprised of a fixed rate note for the loan in

2  question as well as the associated mortgage.

3      Q.      When have you seen these before?

4      A.      I filed the certification in this

5  case several months ago and these documents were

6  part of that.

7      Q.      Okay.  You understand that this is --

8  these are the operative documents establishing a

9  contract between my client and your client.  I'm

10 sorry my client and your employer?

11              MS. ZAVATSKY:  Objection to the

12 extent that you're asking for a legal conclusion but

13 you can answer.

14              THE WITNESS:  These are the

15 contracts, yes.

16     Q.      Is there any other document to which

17 we should refer to establish the terms of the

18 contract between these parties?

19              MS. ZAVATSKY:  Objection to the

20 extent you are asking for a legal conclusion.

21              THE WITNESS:  Not that I am aware of.

22 As I said, your notice didn't ask me to look for

23 those things, so I didn't go look for anything.

24     Q.      This is going to be Exhibit 2.

25              (Whereupon Exhibit-2 was received and

1  marked for identification.)

2       Q.      Mr. Dolan, have you seen this

3  document before?

4       A.      Yes, I have.

5       Q.      If we go to the last page, is that

6  your signature on the certification?

7       A.      Yes, it is.

8       Q.      Is everything in this document true

9  to the best of your knowledge?

10      A.      Yes.

11              MS. ZAVATSKY:  Take your time and

12  read it.

13              THE WITNESS:  I wouldn't have signed

14  it, if it was wrong.  It takes me about an hour to

15  go through each of these.

16      Q.      May I infer from your testimony

17  therefore that it took you about an hour to go

18  through this?

19      A.      Yes.

20      Q.      If we go to the very last

21  interrogatory Number 12, asked the location of the

22  note.  And you state that the note and mortgage have

23  resided at a secure facility in San Antonio, Texas.

24              What's the address of that facility?

25              MS. ZAVATSKY:  Objection.  For

```
 1   security reasons we're not going to be disclose the
 2   address of the secure facility.
 3                    MR. WINCHELL:  Are you instructing --
 4                    MS. ZAVATSKY:  We don't want someone
 5   to come blow up the vault.  And you think that is a
 6   joke but you know what, there are crazy people in
 7   the world, we're not going to disclose the address
 8   of the secure facility.  I am instructing my client
 9   not to answer.
10                    MR. WINCHELL:  And the basis of the
11   objection is what?
12                    MS. ZAVATSKY:  The basis of the
13   objection is security.  There's no relevance to the
14   physical, actual location outside of the fact that
15   it's in San Antonio.  You don't need to know what
16   building it's in.
17                    MR. WINCHELL:  Is there a basis in
18   the New Jersey rules of court to prevent him from
19   answering?
20                    MS. ZAVATSKY:  Yes, relevance.
21                    MR. WINCHELL:  To prevent the witness
22   from testifying to a question?
23                    MS. ZAVATSKY:  Yes.  I am interposing
24   a security and relevance objection.  You can take
25   that up with the court if you would like.
```

1          MR. WINCHELL:  So the basis of

2   refusing to allow the witness to testify is security

3   and relevance?

4          MS. ZAVATSKY:  Security, relevance,

5   outside of the scope of the deposition notice.

6          MR. WINCHELL:  Okay.

7          Because of that we are going to have

8   to keep the deposition open at the end of the day.

9   You might have to come back, I apologize.

10          MS. ZAVATSKY:  I don't think so.

11   That is not part of the deposition notice.  You can

12   reread your deposition notice.  We are making the

13   objection.  You do not need to know the actual

14   address of where the note is.

15          Can you tell me why you need to know

16   that.

17          MR. WINCHELL:  It doesn't matter why

18   I need to know that, even whether I need to know

19   that.  The issue is I am asking a question and

20   there's no basis to deny -- to prevent the witness

21   from answering the question.

22          The witness is here, I can bring the

23   witness back for another deposition just to answer

24   that question or to answer another question that is

25   outside the scope of this deposition.  I want to try

```
 1   to make it easier on the witness so we don't have to
 2   call him back.
 3                You happened to bring the same
 4   witness in who happened to certify in response to
 5   the discovery request.  So, rather than bringing him
 6   back, I would rather he just answer now but if we
 7   have to bring him back, we do.
 8                MS. ZAVATSKY:  In the event the judge
 9   orders him to answer that question, that one
10   question, it can be answered by written deposition.
11   I don't think we would need to bring this witness
12   back.
13                MR. WINCHELL:  It could be answered
14   by written deposition then, he can do it orally now,
15   same thing.
16                MS. ZAVATSKY:  Allow me a minute to
17   confer with my client.
18                MR. WINCHELL:  Absolutely.
19                (Whereupon a discussion was held off
20   the record.)
21                MS. ZAVATSKY:  With the objection
22   interposed, my client has indicated they will allow
23   him to answer the question.
24                THE WITNESS:  Same as my business
25   address.
```

1       Q.      There you go.

2               So if there's a security reason, you

3   are at the same risk that the documents might be?

4       A.      I am a hundred yards from the vault.

5       Q.      Okay.  I understand from your

6   certification and your testimony today that the

7   plaintiff herein acquired the subject note and

8   mortgage that is Exhibit 1 to this deposition.

9               Can you describe how that happened?

10      A.      Yes, sir.

11              The original note and mortgage was

12  executed on May 31, 2007 between World Savings Bank

13  and Joseph M. Fiorilli, and pardon me if I butcher

14  their names, and Carol A. Fiorilli.

15              In the fourth quarter of 2007, World

16  Savings Bank, Federal Savings Bank, changed its name

17  to Wachovia Mortgage Federal Savings Bank.

18              From 2007 until December 31, 2009 the

19  note was held in the vault in Texas by Wachovia

20  Mortgage, formerly known as World Savings.

21              In the fourth quarter of 2009,

22  Wachovia Mortgage Federal Savings Bank changed its

23  name to Wells Fargo Bank of the Southwest NA.  They

24  changed their charter from a federal savings bank to

25  a national bank, then subsequently merged with Wells

```
1    Fargo Bank NA.
2                  Wells Fargo Bank NA is successor by
3    merger to World Savings Bank.
4         Q.      When you say subsequently, when did
5    that happen?
6         A.      The same day.  They did the name
7    change, the charter change and the merger
8    simultaneously.  That is all memorialized by a
9    letter from the office of the comptroller of
10   currency.
11        Q.      What date did that occur?
12        A.      I don't recall the exact date.  It
13   was -- we have the certification letters if you want
14   to show me that, it will show you exactly what date
15   it is.
16                That is not a business record of the
17   bank because the bank didn't write the letter.  That
18   is why we get certified copies.
19        Q.      I'm sorry.  It's not a business
20   record of the bank?
21        A.      I can't testify as it's something
22   that we received, but we did not -- we did not
23   create the document, therefore I can't -- as a
24   general rule, have it be a business record, which is
25   why we routinely get certified copies of a
```

1   government document.

2        Q.        I understand what you are saying now.

3                  MS. ZAVATSKY:  For the record, if it

4   will help clear it up, the letter from the office of

5   the comptroller of currency sets that merger date

6   between Wachovia and Wells Fargo was November 1

7   2009.

8        Q.        Fantastic.

9                  Were there any documents that

10  governed this merger and acquisition that you

11  described in November of 2009?

12       A.        There is a document where we filed

13  applications with the offices of comptroller of

14  currency.  They would either approve or deny the

15  application, if they approved it and they issued a

16  letter stating they approved this name change,

17  charter change and merger.

18       Q.        Was this application produced to me

19  in conjunction of discovery that has taken place?

20       A.        You would not be entitled to an

21  application.  That is covered under private

22  regulated institution, regulator privilege.

23                 MS. ZAVATSKY:  Objection.

24                 THE WITNESS:  You would have to ask

25  the regulator for permission to release that

```
 1    information.
 2                    MS. ZAVATSKY:  I would make that
 3    objection, regulatory privilege.
 4                    MR. WINCHELL:  Did you make that
 5    objection in response to discovery?
 6                    MS. ZAVATSKY:  It is not clear to me
 7    that you requested that document.
 8                    THE WITNESS:  No document we have
 9    ever produced to anyone is an application for a
10    merger, that's a confidential document with my
11    regulator.
12        Q.      Why is it confidential?
13                    MS. ZAVATSKY:  Objection.  Regulatory
14    privilege.
15                    THE WITNESS:  Because is a
16    communication with my regulator.
17        Q.      And what is confidential about that?
18                    MS. ZAVATSKY:  Objection.  Regulatory
19    privilege.
20                    THE WITNESS:  The regulators consider
21    it privileged.
22        Q.      The regulator, what do you mean by
23    that?
24        A.      The regulator says, correspondence
25    between a regulated institution and the regulator is
```

```
 1  private, confidential information.
 2        Q.      How does the regulator say that?  Is
 3  there a regulation specifically so provided?
 4              MS. ZAVATSKY:  Objection.  You're
 5  asking him for a legal answer.  You can answer.
 6              THE WITNESS:  I don't know which one
 7  it is but there is something there.  We have never
 8  produced it.  I'm not the attorney.
 9        Q.      I understand that.  I understand that
10  you are not the attorney.  I simply asked whether it
11  has been produced?
12        A.      And the answer would be no.
13        Q.      And the reason why is that you
14  believe it's a privileged?
15        A.      That's correct.
16        Q.      Are there any other documents which
17  govern any aspect of this merger that we have not
18  discussed yet?
19        A.      The only relevant document is the
20  regulator's approval of the merger.
21        Q.      I want to be very clear, I am not
22  asking you to determine whether something is
23  relevant or not relevant, I am asking whether there
24  are any other documents.  They might be irrelevant,
25  you might decide they are irrelevant, I am not
```

```
 1   asking that.  I am asking whether there are any
 2   other documents which pertain to this merger that
 3   you have described that have not been discussed thus
 4   far today?
 5         A.        I do not know of any other relevant
 6   documents.
 7         Q.        I'm going to ask the question again?
 8         A.        I don't know of any documents that
 9   would relate to this particular loan individually.
10         Q.        I'm not asking about this particular
11   loan individually, I am asking about the merger that
12   you have described?
13                   MS. ZAVATSKY:  Objection.  Outside of
14   the scope.  You can answer.
15                   THE WITNESS:  I do not know.  I did
16   not study all the relevant documents that were
17   communicated with my regulator or other parties
18   because it wasn't in your notice of deposition.
19         Q.        To be clear, my notice of deposition
20   was talking about how this particular entity, your
21   current employer, acquired the loan of my clients.
22                   The way you have described that is
23   through a merger, however, the only documents that
24   we have with respect to the merger are I think two
25   letters.  I am asking if there are any other
```

```
 1   documents, other than the two letters and other than
 2   the application that you have described?
 3        A.        There is only one letter.  One letter
 4   has a merger.  The other letter is a name change.  I
 5   do not know the answer to your question.
 6        Q.        You don't know?
 7        A.        About what other documents may or may
 8   not have been produced that are relative to the
 9   merger.
10        Q.        I am not asking what has been
11   produced --
12        A.        I have no idea.
13        Q.        Let me finish the question, then you
14   start the answer.  Okay.
15                  Are there any other documents that we
16   have not described, other than the letter that you
17   have described, and the application that you have
18   described, which govern the merger?
19        A.        I do not know.
20        Q.        To the extent this was not clear in
21   my document request, I expect these documents to be
22   produced to the extent that they exist and I want
23   you to certify as to whether there are such
24   documents or not.
25                  MR. WINCHELL:  If you believe you are
```

1  going to withhold the document, which you are

2  entitled to withhold the document, I want you lay

3  that out so you can say on what grounds they are not

4  subject to be produced?

5            MS. ZAVATSKY:  I will object to that

6  request on THE grounds of standing, on THE grounds

7  of relevance, on grounds of bank examination

8  privilege, on grounds of regulatory privilege.  You

9  and I can have a discussion about whether those

10  documents will be produced after the deposition.

11            MR. WINCHELL:  Fair enough.

12            MS. ZAVATSKY:  And you don't need to

13  answer anything.

14            THE WITNESS:  No.  It wasn't a

15  question at all --

16            MR. WINCHELL:  It was a clarification

17  of a document request.

18            THE WITNESS:  -- you asked.

19            MR. WINCHELL:  I apologize.

20            MS. ZAVATSKY:  I'm going to object to

21  the introduction of this document as outside of

22  scope of this litigation and outside of scope of

23  this deposition.

24            MR. WINCHELL:  Okay.

25                          Three.

1          (Whereupon Exhibit-3 was received and
2   marked for identification.)
3          Q.     Mr. Dolan, I am actually only going
4   to ask you about the first couple pages of this but
5   please take a look at the first couple pages.
6          A.     Beginning where?
7          Q.     Beginning at the beginning.
8          A.     Yes, sir.
9          Q.     Is everything on the first several
10  pages true?
11         MS. ZAVATSKY:  Objection.  You
12  haven't asked him what this document is and we
13  object to any testimony regarding this document as
14  outside of the scope of this deposition and outside
15  of the scope of the notice.
16         MR. WINCHELL:  I will leave that as a
17  standing objection to everything about this
18  document.
19         THE WITNESS:  So for the record let's
20  describe the document.  The document is a
21  declaration of Michael Dolan dated April 26 -- dated
22  April 6, 2012 in a California lawsuit, Patricia
23  Martin plaintiff versus World Savings Wachovia
24  Mortgage and Wells Fargo Bank.
25         To the best of my knowledge

1    everything in this document is true.

2         Q.       Okay.  First two numbered paragraphs.

3    If there's anything that is incorrect, please let me

4    know.

5         A.       No, sir.  As of the date of this

6    document that was correct.

7         Q.       Is it still correct?

8         A.       As -- well, I do not work currently

9    for Wells Fargo as an operations analyst.  So as of

10   the date of the document, in 2012, it's stated my

11   position and what I did correctly.

12        Q.       Okay.  So your position at Wells

13   Fargo is now different from operations analyst?

14        A.       That's correct.

15        Q.       What is it now?

16        A.       I'm research and mediation manager.

17        Q.       Okay.  Is there anything else in

18   paragraph 2 which is no longer correct?

19        A.       No.  I believe everything else is

20   correct.

21        Q.       Very good.

22                 (Whereupon Exhibit -4 was received

23   and marked for identification.)

24                 THE WITNESS:  I do want to point out

25   for the record Exhibit 3 is an incomplete document.

```
 1              MR. WINCHELL:  Yes.  I'm sorry.
 2  There are a bunch of exhibits, I didn't include just
 3  because I didn't want to make this heavier than it
 4  needed to be.
 5              THE WITNESS:  I just want the record
 6  to be clear as to what each of the documents are.
 7              MR. WINCHELL:  Correct.
 8              If it matters for the purposes of the
 9  deposition I can add the exhibit but I don't think
10  its necessary.
11              MS. ZAVATSKY:  As we are objecting to
12  the admissibility of that exhibit anyway, and any
13  questioning about it, it doesn't matter to me at
14  this point.
15  BY MR WINCHELL:
16      Q.      Okay.  Mr. Dolan have you seen
17  Exhibit 4 before?
18      A.      Yes, I have.
19      Q.      Do you recall when?
20      A.      I reviewed Exhibit 4 within the last
21  week as part of my preparation for deposition today.
22      Q.      Your preparation for today?
23      A.      For today.
24      Q.      I thought you said preposition?
25      A.      No.  For the deposition today.
```

```
1          Q.       For the deposition, got it.
2                   If you look at the top of the first
3    page, do you see an INV number?
4          A.       Yes, I do.
5          Q.       Okay.  What does that refer?
6          A.       That refers to internally how we
7    categorize loans who the investor would be.
8          Q.       Who is the investor?
9          A.       As of 12/31/2007 the investor number
10   is 81 which is Wachovia Mortgage Federal Savings
11   Bank.
12         Q.       The other number, the INV number
13   after that 36804, do you see that?
14         A.       That is the clarification of the
15   loan.  We have a category of loan.  That other
16   number is -- I have really no idea why we have that
17   number.  I have never had it be relevant or searched
18   by that number.  I have always looked at the
19   investor number and the category number.
20         Q.       So you don't know what the INV number
21   refers to?
22         A.       I do not.
23                  MS. ZAVATSKY:  Can I have you
24   stipulate something?  The last five numbers of INV
25   number are the same as the last five numbers of the
```

```
1  loan number.
2              THE WITNESS:  I believe it's an
3  inventory number.
4              MR. WINCHELL:  We don't need to
5  stipulate to that.
6              MS. ZAVATSKY:  I don't want to
7  testify as to this deposition, but just to help you
8  along on that questioning.
9              THE WITNESS:  Right.  In fact if we
10 look at the year end 2008, which is just a few pages
11 later they actually have the entire number there and
12 not the last ones.
13      Q.      Is this the complete -- sorry can you
14 describe this document?
15      A.      This is the loan history starting
16 when the loan was originated in 2007, this history
17 goes through 12/31/2012, through the archive system
18 and then reflects the activity on the loan through
19 October 16, 2013.
20      Q.      Is this -- would you describe this as
21 a complete loan history?
22      A.      Uh --
23              MS. ZAVATSKY:  I'm going to object to
24 that just because I am -- you requested a document
25 with respect to this deposition that I am producing
```

1  today and I'm going to produce it to you right now
2  but then upon doing that I can -- he can answer the
3  question.
4            There you go.  And in the event you
5  want to question on it, this is a copy of it.
6            MR. WINCHELL:  Okay.  We will call
7  this four.
8            (Whereupon Exhibit-5 was received and
9  marked for identification.)
10            THE WITNESS:  You had a question I
11  believe.
12       Q.     Yes, with -- well, I'm going to
13  change my question now.
14       A.     Okay.
15       Q.     With the inclusion of Exhibit 5,
16  would you describe the Exhibit 4 as being a complete
17  loan history?
18       A.     Through October 16, 2013 it is.
19       Q.     And how would you describe Exhibit 5?
20       A.     Exhibit 5 is a subpart of the payment
21  history.  What Exhibit 5 does is tells the system
22  who gets the payments that are remitted by the
23  customer.
24            So Exhibit 4 shows me all of the
25  customer's payments, all of the disbursements by the

```
 1   bank for tax and insurance.
 2                Exhibit 5 shows me where -- which
 3   investor would be getting the funds, if it's sold.
 4        Q.      If it's sold?
 5        A.      Yes.
 6        Q.      If what is sold?
 7        A.      If the loan is sold to a third party.
 8   In this case it was not sold to a third party, it
 9   was put into a different classification, which is
10   reflected shortly after origination.  It says to
11   World Savings Bank, it really is classifying the
12   loan from investor 10 to investor 81 meaning the
13   loan was eligible to be placed in a real estate
14   mortgage investment certificate, otherwise know as a
15   REMIC.
16                On or about effective March 1, 2008
17   the loan was transferred into a REMIC, the Bank of
18   New York is the trustee for the REMIC, the owner of
19   the REMIC was World Savings or Wachovia Mortgage.
20                When the loan went delinquent in
21   2011, because it no longer was able to be used as
22   collateral which is what the REMICs are for is
23   collateralization of our federal home loan bank
24   advances, it was removed from the REMIC and placed
25   into the Wachovia Mortgage FSB which is now Wells
```

1   Fargo category.

2          Q.      So what's the name of REMIC?

3          A.      World Savings REMIC number 33.

4          Q.      World Savings REMIC number 33?

5          A.      Yes.

6          Q.      Are the operational documents for

7   that REMIC publicly available?

8          A.      I do not know.

9                  MR. WINCHELL:  I'm going to make a

10  request for the organizational documents with

11  respect to that REMIC including, without limitation,

12  the pooling and servicing agreement and all exhibits

13  thereto be produced to me.

14                 MS. ZAVATSKY:  I will object to that

15  request on the grounds of standing, on grounds of

16  relevance and on grounds of potential privilege.  I

17  would need to check on that but we can discuss that

18  after the deposition.

19         Q.      I think it's likely that because of

20  this we are going to have to keep this deposition

21  open to ask you further questions about it once I

22  see the copies of the organizational documents.

23                 I am putting that on the record not

24  because I am trying to be difficult.

25         A.      I have seen the documents, it's a

```
 1   contract with myself.
 2          Q.       What is a contract with yourself?
 3          A.       The REMIC.
 4          Q.       You are the REMIC?
 5          A.       We are the REMIC.
 6          Q.       We are?
 7          A.       The bank made a contract with itself.
 8   So if I explain the REMIC and why we do it, that
 9   might help you understand what's going on.
10          Q.       If you would explain the REMIC by all
11   means, I'm happy to hear it.
12          A.       So, the savings banks borrow large
13   quantities of money from the Federal Home Loan Bank
14   of San Francisco.
15               The way they do that is the Federal
16   Home Loan Bank Board in Washington issues notes to
17   the general public, they loan the money to the 12
18   regional home loan banks, we were a member of the
19   San Francisco Bank, we borrowed tens of billions of
20   dollars from them.  You had to provide collateral.
21               So in the old days we would stamp our
22   notes, pay to the order of the Home Loan Bank of San
23   Francisco.  In the event that the bank was put into
24   receivership, all of those notes would become
25   property of the Federal Home Loan Bank of San
```

```
 1   Francisco because their collateral for the
 2   borrowings that the bank got from them.
 3                   Over the years, to simplify things
 4   and things got modern, we found that we could put
 5   these into a real estate mortgage investment
 6   certificate, and use the certificate as collateral
 7   for the advances.  And it would save the bank money
 8   because the Bank of New York as trustee for the
 9   REMIC would have the responsibility to come to San
10   Antonio, to our secured vault to collect all the
11   mortgages, instead of the Federal Home Loan Bank of
12   San Francisco having to do that.
13                   So in essence I took money out of my
14   right pocket and put it into my left pocket.  If you
15   were to read probably the 2005, 2006 Securities and
16   Exchange Commission for Golden West Financial they
17   highlight this to say that even the SEC calls it a
18   wash sale.
19                   It's not a sale and we are required
20   to report it in our accounting reports on our 10Ks
21   as a loan receivable as if there was no transaction
22   at all.
23                   So do I own the loan if it's REMIC?
24   Yes, it's my left pocket.  Can I use it as
25   collateral once it goes delinquent?  No.
```

```
 1                    So I have to take it out of my left
 2  pocket, put it into my right pocket and not be able
 3  to count it as collateral but I still own the loan.
 4          Q.      I want to clarify:  Real estate
 5  mortgage investment?  Conduit --
 6          A.      No these are certificates.
 7          Q.      But the REMIC stands for conduit
 8  not --
 9          A.      I did certificates.  It's my own
10  contract.
11          Q.      Let me back up.
12                  When I think of a REMIC, typical
13  mortgage investment trust which I deal with every
14  day, that is a real mortgage investment conduit that
15  is what the REMIC stands for.
16                  Is this something different from how
17  the term is generally used?  Are you talking about
18  something different than REMIC as defined under the
19  internal revenue code that I see all the time?
20          A.      We call it a certificate.  It is part
21  -- it qualifies under internal revenue code because
22  it's a wash sale for the IRS.
23          Q.      So it's the same principal, slightly
24  different term, same acronym for something that can
25  be described slightly different?
```

```
 1        A.        I do not know the answer to being
 2   exactly the same or what differences they would be.
 3   I can only describe how we do the transaction, not
 4   how others do it.
 5        Q.        Okay.  But the REMIC issued
 6   certificates; is that what you are saying?
 7        A.        Yes.  And the ownership of the
 8   certificates is the issuer of the loans.
 9        Q.        Okay.
10        A.        So we sold loans to ourself which is
11   a wash sale.  You can't sell something and buy it
12   back and call it a sale, especially when you do it
13   simultaneously.
14             It was done purely so we can have
15   collateral for our Federal Home Loan Bank of San
16   Francisco advances.
17        Q.        May I infer from your testimony that
18   you -- that the loan was in default in approximately
19   August of 2011?
20             I am looking at the second page of 5?
21        A.        Yes.  And I am trying to tell him
22   that I can be exact --
23        Q.        And that is even better?
24             MS. ZAVATSKY:  If we can have the
25   record reflect the Exhibit -- the witness is looking
```

1    at Exhibit 4.

2                    MR. WINCHELL:  That is fine.

3                    I'm fine with wherever the

4    information comes from.

5                    THE WITNESS:  The loan defaulted May

6    1, 2011.  So after it went 60 days past due we

7    removed it from the REMIC.

8         Q.       And how can you tell that it

9    defaulted in May of 2011?

10        A.       If I look at that time.

11        Q.       The Bates number in the corner?

12        A.       Bates stamp 1332, in the upper right

13   hand corner it reflects 12/30/11 page 79, 130 just

14   below that a couple of lines, you will see the term

15   due date.

16        Q.       Yes.

17        A.       05/01/11 was the date that it's

18   currently due for.

19        Q.       And --

20        A.       Now if you go to page 1333 and the

21   second -- the third to the last transaction, you

22   will see over on the right hand side it says, full

23   settlement prin 1,472,347.14.

24                    Full settlement that is meaning we

25   did the full settlement with the REMIC and it was

```
 1  repurchased.
 2         Q.       And that is the date on which you
 3  accelerate the loan?
 4         A.       We don't accelerate loans until the
 5  foreclosure action is filed.
 6                  We don't have a notice of
 7  acceleration.  It's not part of our contracts.  We
 8  send a notice.  We send a please pay notice.  I'm
 9  not aware that we sent any noting of acceleration
10  until the lawsuit is filed.
11         Q.       And is the acceleration shown on the
12  loan history in any form?
13         A.       I'm not aware of any acceleration
14  until lawsuit is filed and they are not making
15  payments so...
16         Q.       I understand that.  The lawsuit was
17  filed before the end of this, during a period in
18  which this loan history covers?
19         A.       Yes -- no.
20                  MS. ZAVATSKY:  Can I just object to
21  form.  Can you define what you mean when you are
22  saying acceleration?  I think you might be talking
23  about two different things.
24                  MR. WINCHELL:  He answered before
25  objection.
```

1    Q.        At what point in time is the full

2  amount of the loan deemed to be due according to

3  Wells Fargo?

4    A.        I would have to -- I have no idea in

5  New Jersey.  It varies state to state.  Some states

6  allow people to reinstate the loan five days before

7  foreclosure sale.  I don't know what local law is.

8  I know I don't have notice of acceleration that I

9  send to borrowers.

10   Q.        If you look at that Exhibit 4, the

11 page numbers go sequentially for a few pages and

12 then they jump a few thousand.

13   A.        Yes, sir.

14   Q.        Can you explain why that is?

15   A.        Yes, I can.

16             What these are is at the end of every

17 calendar year, we do an archiving process and what

18 happens is --

19   Q.        Okay.

20   A.        -- we do an annual loan history for

21 that entire calendar year for every loan.  This loan

22 number ends in 36804.  It just so happened to be the

23 starting number for it was page 69,635.

24             The loan before that loan number --

25 before this loan number would have been the pages

1   before.   The subsequent year, I may have different

2   loan numbers, so this was actually done in 2007.

3   The next one was done at the end of 2008, and then

4   put in an archive, so we produced these out of our

5   archives.

6          Q.       So you produced these each year to

7   create a loan record, a loan history?

8          A.       Yes.

9          Q.       That could be archived and kept for

10  future uses?

11         A.       Correct.

12                  Which is why if you look at the end

13  of the document, it includes only the activity for

14  2013 because when this was produced we he had not

15  yet done the annual archiving.

16         Q.       Understood.

17                  And am I correct that it's relatively

18  easy for the bank to produce this document when we

19  ask?

20                  MS. ZAVATSKY:  Objection to form.  As

21  to relatively easy, but you can answer.

22                  THE WITNESS:  I don't do production

23  so I just ask for it.  I can't answer your question.

24  I don't know.

25         Q.       When you ask for it, how long does it

```
 1  take you to get it?
 2       A.     I ask and usually have -- I give them
 3  a week's time.
 4       Q.     Does Wells Fargo ever act as a
 5  mortgage servicer?
 6              MS. ZAVATSKY:  Objecting as to
 7  outside of the scope deposition notice.  You can
 8  answer.
 9              MR. WINCHELL:  We have that
10  stipulation that there is a standing objection for
11  every question.
12              MS. ZAVATSKY:  Yes.
13              THE WITNESS:  So my answer is this,
14  and I hate to do this to you, but we have been in
15  business 150 years.  I don't know what they did in
16  1888, so I can't answer your question when you use
17  the word ever.
18       Q.     Does Wells Fargo currently service
19  any loans on behalf of other entities?
20       A.     Yes, they do.
21       Q.     Can you name any of those entities?
22              MS. ZAVATSKY:  Objection.  It's
23  outside of the scope of this loan, which I think is
24  the only thing in question here.  But you can answer
25  if you know.
```

1          A.          I know we service loans for Fannie
2    Mae and Freddie Mac.
3          Q.          And to be clear, mortgage servicing
4    involves the collection of loans, a collection of
5    monies that are owed, for example to Fannie Mae and
6    Freddie Mac; is that correct?
7          A.          Mortgage serving involves the
8    collection and the normal day to day servicing
9    application of payments, notices to borrowers, loan
10   statement and the remittance of those funds to the
11   investor.
12         Q.          Do you know whether Wells Fargo acts
13   as the servicer for any REMIC trusts or any of that,
14   in any entities of that nature?
15         A.          We do for our own REMIC's.  I do not
16   know if they do for other REMICs.
17         Q.          Do you know whether Wells Fargo acts
18   sometimes as master servicer for any REMICs that
19   Wells Fargo does not own?
20                      MS. ZAVATSKY:  Asked and answered but
21   you can answer.
22                      THE WITNESS:  Yeah, essentially this
23   loan is on one servicing platform, which is what I
24   am familiar with.  And I don't get involved with
25   what they do on the other servicing platform which

1   is the quote, historical Wells Fargo.

2          Q.        What servicing platform is this?

3          A.        This is called CPI it's a Fidelity

4   System.

5          Q.        That stands for?

6          A.        Computer Powered Incorporated.  It's

7   a standard servicing platform that Fidelity now

8   manages.  It is used by many investors or many

9   servicers.  We have used the same platform for this

10  loan since 1993, there has never been a data

11  conversion, a loan number change, the loan has

12  always been serviced out of San Antonio Texas.

13                   If a borrower were to call on this

14  loan for customer service, they would be talking to

15  someone in San Antonio, because that is where the

16  servicing center is for adjustable loans.

17                   I'm not familiar with all of the

18  servicing Wells Fargo does at its other servicing

19  centers to be able to answer your questions with any

20  intelligence.

21         Q.        But to be clear, you do know that

22  Wells Fargo services loans for Fannie Mae and

23  Freddie Mac?

24         A.        Yes, I am aware of that.

25         Q.        There's no doubt about that part?

```
 1          A.        That's correct.
 2          Q.        Does Wells Fargo ever use MSP or any
 3  other type of servicing platform?
 4          A.        The Wells Fargo platform is MSP, that
 5  is how they refer to it internally.   It's also the
 6  same Fidelity System.
 7          Q.        So the difference between the
 8  Fidelity System and the MSP is negligible.   There is
 9  just different ways of describing the same process?
10          A.        No.
11                    MS. ZAVATSKY:  Objection.  Only to
12  the extent, are you asking him a question about
13  computer systems?
14          Q.        If he happens to know?
15          A.        They are the same basic systems.   The
16  servicing system that this loan is on has been
17  modified so that it can handle adjustable rate
18  lending and loans with biweekly payments.
19                    Whereas those functionalities cannot
20  operate on the Wells Fargo MSP.  As I said we have
21  gone five years now without merging the systems.
22          Q.        Understood, thank you.
23                    If I can get you to look at the
24  second page of Exhibit 4?
25          A.        Yes, sir.
```

1          Q.          If we go to the fourth entry down it
2   looks like November 2007?
3          A.          Yes.
4          Q.          On the far right corner you see an
5   entry of $426.56; do you see that on the right?
6          A.          Yes.
7          Q.          What is that?
8          A.          That would be a servicing fee that
9   was paid by the bank, or the servicing fee the bank
10  gets to keep and the rest of the money gets remitted
11  to REMIC then remits it back to the bank as a REMIC
12  payment.
13         Q.          Is that fee added to the loan?
14         A.          No.  That fee has nothing to do with
15  the loan.
16         Q.          It has nothing to do with the loan?
17         A.          Not as far as the borrower is
18  concerned.  So if I look at what transpired on
19  November 1, is the borrower remitted a check for
20  approximately 9,200.  Their contractual payment of
21  $6,144.81 was applied, and during that month there
22  would have been a negative $3,065 of deferred
23  interest.  They paid that deferred interest, so the
24  loan balance remained the same.  So this customer
25  was paying his interest only payment during that

```
 1  month.
 2        Q.      During the month of?
 3        A.      November.
 4        Q.      November 2007?
 5        A.      Yes.
 6                The 426.56 is how if I look on the
 7  first transaction there was $8,076.25 of interest.
 8  $426.56 of that interest will be retained as a
 9  serving fee, the difference between those two
10  numbers would be remitted as the interest to the
11  REMIC.
12        Q.      So of the $9,000 that is being paid,
13  $426.56 of that is being kept as -- by Wells Fargo
14  as a servicing fee?
15                MS. ZAVATSKY:  Objection.  That
16  misstates his testimony.
17                THE WITNESS:  No.  What it's saying
18  is of the 9,000 remitted, it was applied as $8,076
19  of interest, $1,033.56 to escrow.  Internally the
20  $8,076.75 is not recorded as interest income.  It
21  would be shown as $426.56 of servicing fee and
22  approximately $7,050 as an accounts payable to the
23  REMIC.
24        Q.      Now what would be a fair way of
25  describing to the borrower that of the $9,000 they
```

1    are paying, a portion of that is not being applied

2    to interest and principal?

3          A.     Well, actually --

4                 MS. ZAVATSKY:  Objection to form.

5    Fair way.  But you can answer.

6                 THE WITNESS:  I can -- this --

7    whether the loan is serviced or not serviced and

8    there is a servicing fee has no impact on the

9    borrower.

10                This is accounting for the borrower,

11   we gave them full credit for $8,076.25 to interest

12   paid.  And their 1098 at the end of year would have

13   reflected that.

14         Q.     Did I not understand that they were

15   paying $9,000 --

16         A.     Yes, the $8,076.25 was for interest.

17         Q.     Right?

18         A.     $1,133.56 was for escrow.  That is

19   your $9,000.

20         Q.     And the 426 comes from which of those

21   two numbers?

22         A.     Internally we would go through and

23   give the borrower credit for paying $8,076.25 for

24   interest.  The off setting interest to the borrower

25   paying the interest is 426 would be retained by the

1   bank as a servicing fee.  The remaining $7,600 would
2   be payable to the REMIC as part of the monthly
3   servicing payments that we would make to the REMIC
4   and then the REMIC would remit right back to us.
5        Q.     Why would the REMIC remit it right
6   back to you?
7        A.     Because I'm the owner of the
8   certificate.
9        Q.     It would be remitted --
10        A.     I remit it then it comes back.
11        Q.     Now if I can get you to look at Bates
12   1320?
13        A.     Yes, sir.
14        Q.     If you look at the February 2008 the
15   principal balance there is $1,368,065, am I correct?
16        A.     Yes, sir.
17        Q.     That's the principal amount owing?
18        A.     After the payment of February 1 is
19   applied.
20        Q.     Right.
21               And that amount is greater than the
22   original principal balance of the loan?
23        A.     Yes, sir.
24        Q.     Was the borrower current at this
25   time?

```
 1        A.       Yes.
 2        Q.       Can you explain to me why the
 3   principal balance was greater in February of 2008
 4   than it was at the origination of the loan at the
 5   time that the borrower was current?
 6                 MS. ZAVATSKY:  I'm going to object on
 7   the grounds that this line of questioning has
 8   already been released based on a class action
 9   settlement in which you concede your client is a
10   member.  You can answer.
11                 MR. WINCHELL:  To clarify the judge
12   has already ruled that it's not -- at this point it
13   is not, but go ahead.
14        A.       It's very easy.  Do you need to --
15                 MS. ZAVATSKY:  I'm going to say that
16   I disagree that the judge has indicated that
17   questions about deferred interest and how that is
18   calculated as a part of the note is he is not
19   declared that it is not a part of the -- that is not
20   released by class action settlement.  What he said
21   is that the application of payments is not released.
22   So you can -- that is why I'm allowing him to answer
23   those questions.  I'm putting that in there for the
24   record.  You can answer.
25                 THE WITNESS:  Under the terms of the
```

1   loan at that point in time the borrowers contractual

2   monthly payment was $6,134.11 which included

3   $1,122.86 for escrow and the difference would be the

4   principal and interest amount.  The borrower made

5   that payment that was less than the interest due.

6                   This loan had the ability to have

7   deferred interest or negative amortization because

8   the payment this borrower chose at inception was

9   lower than the interest due on the loan for this

10  given month.

11                  So the borrower chose a payment that

12  was less than interest only.  And if they paid a

13  payment that was less than interest only they would

14  have deferred interest.  So the amount of deferred

15  interest in February of 2008 was $3,065 and you can

16  see that where it says 3,065 negative.

17                  Now prior to this, in looking at page

18  1320 if you look at the January payment you will see

19  their contractual payment $6,134.11 was applied.

20  There was $3,065 of deferred interest and they paid

21  that deferred interest, so it brought the loan down.

22                  February of 2008 was the first month

23  that the borrower paid in what they remitted to the

24  bank an amount that was less than the interest due.

25           Q.        They are making the same payment each

1    of these months; is that correct?   The amount of
2    dollars they are remitting?
3        A.      No.   The amount of dollars they had
4    been remitting was approximately $9,200 up through
5    January of 2008.
6        Q.      Okay.
7        A.      Because if you look at January there
8    is two transactions on 1/2.   There is a sequence
9    number one, sequence number two, those are one
10   amount of 9,200 and something.
11       Q.      And about 88 --
12       A.      Yes.
13       Q.      98.
14       A.      We account for it as here is your
15   contractual payment and here is how much of
16   additional principal you have paid in your
17   contractual payment.
18               What it works out to be is they were
19   paying an amount, they were paying $3,065 more than
20   their contractual minimum through January of 2008.
21               In February, instead of remitting
22   $9,200 they only remitted $6,134.11.   I see the same
23   negative $3,065.   The loan balance went up because
24   they didn't pay that extra $3,000 as a principal
25   reduction, the loan balance increased and it

1  remained that way.

2            That continued into March, the loan

3  balance increased again in March for the deferred

4  interest based on the fact that the initial payment

5  that these borrowers selected at origination was

6  $5,011.25.  That is from page 2 of Exhibit 1 and

7  that is an amount that the borrowers selected, not

8  the bank.  Hence the term Pick a Payment Loan, the

9  borrower picks the payment.

10       Q.       When you say the borrower selected,

11  you're talking about the borrower selecting the

12  initial payment?

13       A.       Yes, sir.

14       Q.       And how do you know that the borrower

15  selected that payment?

16       A.       I'm going to read 3B of the note.

17            Each of my initial monthly payments

18  will be in the amount of $5,011.25.  This amount

19  will change as described in sections 3C and 3D

20  below.

21            My initial monthly payment amount was

22  selected by me from a range of initial payment

23  options approved by the lender and may not be

24  sufficient to pay the entire amount out of interest

25  accruing on the unpaid balance.

1    Q.      What you are saying is that your --
2  that the terms of the agreement provide that the
3  borrower is deemed to have selected the payment?
4    A.      No, not deemed, they did.  They
5  filled out a form that says here is my application
6  for the initial loan payment.  The borrower picked
7  the payment.  That is what Pick a Payment Loan
8  means.
9    Q.      Well, I'm presuming that you weren't
10 there and you don't know who filled out the form
11 but --
12   A.      I have a form for every loan that was
13 signed by every borrower that says I am applying.  I
14 get all the loan forms before I speak to the
15 borrower.  I don't get any signed forms back until
16 after the closing has occurred.
17   Q.      So did you speak to these borrowers?
18   A.      No one at the bank spoke to these
19 borrowers until after the loan funded.
20           So if I have a document signed by the
21 borrower that says I did something, I am going to
22 rely that that borrower is telling me the truth that
23 they are the ones who did it.
24   Q.      No, what you are doing is assuming
25 that that borrower filled out the form and that that

```
 1   is deeming that the borrower made a particular
 2   selection.
 3                   MS. ZAVATSKY:  Objection.  Asked and
 4   answered.  You are asking him to make a legal
 5   conclusion.
 6                   THE WITNESS:  Yeah.  I will let a
 7   judge decide whether a borrower signing a document
 8   means that they did it or that they agreed to it,
 9   and the language therein.
10        Q.       I don't doubt that part about whether
11   they are agreeing to it but you said selected, which
12   I -- I am trying to understand and I am
13   understanding the basis of your testimony is that
14   the form that you are reading indicates that the
15   borrower selected.
16        A.       No.  To get a Pick a Payment Loan --
17   pick a payment doesn't mean you get payment options
18   every month, there is nothing in this note that
19   talks about payment options.
20                   A Pick a Payment Loan means the
21   borrower gets to pick the payment as a way to
22   differentiate the loans originated by World Savings
23   from those of our competitors.
24                   Our competitors would say here is
25   your payment whether you like it or not.  We allowed
```

```
 1   you to pick whatever payment you like as long as it
 2   was within the range.
 3                   Some people would go through and say,
 4   well I don't like to have pennies on my loan, how
 5   about if I just have a payment of 5100 even.  If
 6   that was acceptable, we would take it.  They could
 7   pick and we were given what they wanted to have as
 8   their initial payment, even the notes that they
 9   signed said they picked that amount.
10        Q.       And did you understand that a lot of
11   mortgage brokers were involved in the sale of these
12   loans?
13        A.       A mortgage broker is an agent of the
14   borrower not mine.  I can't help what a borrower did
15   with their agent.  That is between the borrower and
16   the broker.  I'm not a part to their transaction or
17   what they did.  I was given an application.  I have
18   to either approve it or deny it.
19        Q.       Going back to be Exhibit 3.
20        A.       Yes.
21        Q.       Paragraph 2 says you have full access
22   to the loan files, communication logs, records,
23   regarding this loan transaction relationship and
24   history and loan modification efforts considered and
25   made on this loan.
```

```
 1                     Am I correct that that's true with
 2     respect to this loan?
 3                     MS. ZAVATSKY:  My previous objection
 4     to this document still stands, but you can answer.
 5                     THE WITNESS:  Yes.
 6          Q.       Were there any communications between
 7     the borrower and Wells Fargo with respect to this
 8     loan?
 9                     MS. ZAVATSKY:  Outside the of scope
10     of deposition notice, but you can answer.
11                     THE WITNESS:  I did not review that
12     on this loan, because your notice didn't cover it.
13                     I can look at that to see how it
14     transpired.  Then it would be at what relevant time.
15          Q.       Okay.
16          A.       But that wasn't part of your notice.
17     It's an easy question to answer but I didn't
18     research it.
19          Q.       Understood.
20                     But I am correct that Wells Fargo
21     keeps records of such communications -- is that how
22     I understood the testimony both today and in this
23     declaration?
24          A.       Yes, we do.
25                     MS. ZAVATSKY:  Outside of the scope.
```

```
 1                 MR. WINCHELL:  Let's stipulate again.
 2   Stuff is outside of the scope.
 3                 THE WITNESS:  We keep records.
 4       Q.        Do you record the calls that come
 5   from the borrower or that are made to the borrower?
 6       A.        So that is really going to be subject
 7   to what time frame.
 8                 Currently, we record most of the
 9   calls but for most of the time, we did not have call
10   recording.
11       Q.        When did you start call recording?
12       A.        We started in mid 2011 with selected
13   calls as they were working the kinks out of the
14   system, and I think by 2012 it was on collection
15   calls as well as most of the loss mitigation calls.
16       Q.        Okay.  Not every call was recorded?
17       A.        Not every call was recorded.
18                 MR. WINCHELL:  This is -- what's the
19   next number, 6?
20                 (Whereupon Exhibit-6 was received and
21   marked for identification.)
22       Q.        Mr. Dolan, have you seen this
23   document before?
24       A.        Yes, I have.
25       Q.        Do you recall when?
```

1          A.         In February of 2014.

2          Q.         And if we go to the last page is this

3    your signature on the certification?

4          A.         Yes, it is.

5          Q.         Okay.  I will note for the record the

6    certification isn't the certification we normally

7    use for document requests, because you are supposed

8    to certify that you reviewed the records and

9    produced the documents within your possession but

10   I'm going -- so therefore I'm going to ask you now.

11                    Did someone at Wells Fargo review the

12   documents that were in Wells Fargo's possession to

13   determine that all documents were being produced

14   that were responsive to this document request?

15         A.         Yes.  Subject to the objections.

16         Q.         Fair enough.

17                    Did Wells Fargo produce all of the

18   communications with my client with respect to any

19   loss mediation efforts?

20         A.         I don't remember exactly what was

21   produced, so I believe they did.

22         Q.         Okay.

23         A.         Not something to go over today.

24         Q.         Understood.

25                    In my review of the documents

1  produced I saw no notes with -- communications with

2  my client, no internal notes, we were received no

3  recordings of any calls and no communications -- for

4  the most part no communications with my client other

5  than some of my client's communications to Wells

6  Fargo.

7               So as far as I can tell the document

8  response was not responsive at all particularly with

9  respect to the loss mitigation efforts.

10              So I'm going to put on the record a

11 request that all such documents be produced because

12 it's fairly clear to me that they were not.

13              MS. ZAVATSKY:  I object to the

14 characterization.  The entire correspondence file

15 regarding loss mitigation was produced to your

16 client -- was produced to you in discovery.  I

17 understand and we can discuss that off the record

18 today.

19              MR. WINCHELL:  Why don't we take a

20 break.  I will give you the documents you produced.

21 You can show me the documents which reflect the

22 internal notes with respect to loss mitigation and

23 the recordings of the telephone calls.

24              MS. ZAVATSKY:  We can absolutely

25 discuss what was and wasn't produced later.  We

```
 1  don't need the witness here to do that.
 2              I am saying what was produced to you,
 3  your characterization of what was produced is not
 4  accurate in that it only contains documents that
 5  your client sent to my client.
 6              For example, we had documents that my
 7  client sent to your client.  There was lots of
 8  correspondence that was produced to you.
 9              MR. WINCHELL:  There were some
10  documents that Wells Fargo produced that were from
11  Wells Fargo to my client.  There were no recordings,
12  there was no documents about loss mitigation.
13              MS. ZAVATSKY:  I would argue that is
14  not relevant to this matter because you hadn't
15  raised a claim about loss mitigation.
16              So we can continue this discussion
17  after the deposition.
18              MR. WINCHELL:  Well, even if we
19  hadn't raised a claim about loss mitigation when we
20  request a document, that might not be relevant is
21  not the grounds to withhold it.
22              MS. ZAVATSKY:  You can make an
23  objection to the judge.  I feel like I need to
24  produce documents to you that are relevant to the
25  claims that you are making.  I don't need to produce
```

1  everything in Wells Fargo's possession that might

2  somehow have some relation to something you might

3  want to make at some point.

4           MR. WINCHELL:  If you don't want to

5  produce a document you have to state that you are

6  withholding a document.

7           MS. ZAVATSKY:  We can absolutely have

8  this conversation after the deposition.  We don't

9  need to have the witness here.

10  BY MR. WINCHELL:

11       Q.      Were there any property inspections

12  done or appraisals done on this property?

13       A.      You have two questions there so I'm

14  going to break it down.

15       Q.      Yes, either one.

16       A.      Yes.  There were property inspections

17  done.

18       Q.      Okay.  Do you know if you produced

19  the reports of the property inspections?

20       A.      We don't have those.  We just get --

21  we just get a computer thing saying it's occupied.

22  We don't need anything more for internally.  We are

23  looking to see if it's occupied.  If it's unoccupied

24  then it gets into some more matters.  Does it need

25  to be winterized?  Does it need to be lawn mowed?

```
 1    Is it being maintained?
 2          Q.      So you looked at the back of the loan
 3    history to see if there were property preservation
 4    notes?
 5          A.      Yes.
 6          Q.      $15 --
 7          A.      Yes.  $15 a month.
 8          Q.      And I am inferring correctly from
 9    your testimony that each of these entries is
10    reflecting a property inspection?
11          A.      It's reflecting that I paid a third
12    party vendor $15 to drive by the property.
13          Q.      And the third party vendor was trying
14    to determine what?
15          A.      Was it occupied, was it secured?
16          Q.      And does the third party vendor
17    provide you with such information?
18          A.      Electronically, yes.
19          Q.      And when you say electronically, what
20    do you mean?
21          A.      I mean they put in that it is
22    occupied.
23          Q.      They put in what?
24          A.      They put it into their system that
25    the property is occupied and there is nothing that
```

1    needs to be done at this point.

2            Q.      And you get a report from that entry?

3            A.      If I  -- no.  I don't make a report.

4            Q.      No, do you get a report, not make a

5    report?

6            A.      No.  No.

7            Q.      It's simply an entry on --

8            A.      On ours it is, yes.

9            Q.      -- in your system?

10           A.      We only ask for a report if there's

11   something wrong with the property.

12           Q.      How do you know from the inspection

13   from the third party vendor that the property is

14   occupied?

15           A.      They are telling us, date, a code

16   that says it's occupied and that's it.

17           Q.      They tell you in a system --

18           A.      They put into a system, it comes over

19   to us.  If it's occupied, why do I need to report?

20   I don't.

21           Q.      When I am saying report I don't mean

22   something formal.  I am talking about some sort of

23   collection of data that shows whether the property

24   is occupied or is not occupied.  And we don't have

25   that data as far as I can tell?

```
1           A.      I have no idea what to tell you.  I
2  don't know where it's relevant because we're not
3  charging your client those amounts that I know of.
4           Q.      You're not charging them the $15?
5           A.      It's not being added to their loan
6  balance.  It's being held by me as an account
7  receivable and I will decide at judgment whether I
8  want to try and collect it or not.
9           Q.      You are saying it hasn't yet been
10 added?
11          A.      None of those funds have been added
12 to the loan balance.  In fact we can look at the
13 loan balance today of $1,470,949.38 and if we go
14 back to when they stopped making payments it would
15 be the exact same number.
16                  I can't add those amounts to the loan
17 balance.  The contract doesn't allow it.
18          Q.      You can't add them now?
19          A.      I can't add them ever to the loan
20 balance.
21          Q.      At judgment can you add them to the
22 loan balance?
23          A.      No.
24                  MS. ZAVATSKY:  Objection to the
25 extent you are asking him a legal question but you
```

 1  can answer.
 2              THE WITNESS:  I can add to the total
 3  amounts due, if I feel like it.  I can also add all
 4  property taxes and insurance I may have paid to the
 5  total amount due.  But that doesn't impact -- what
 6  the total amount due includes the loan balance,
 7  accrued interest, that isn't added, corporate
 8  advances, they are all separate categories as to
 9  what the total amount due is.
10              But when I look at the loan balance I
11  have to be very specific because according to what I
12  have here in Exhibit 1 is I have a mortgage and it
13  says the maximum amount I'm secured by the principal
14  is a billion seven.
15              Well, I might have 2 or $300,000 of
16  past due taxes and interest, but I have to call
17  those taxes and interest in every state in America
18  because that is what they are, unpaid taxes, unpaid
19  interest, but it's not the loan balance.
20              The loan balance is the same today as
21  it was after they made their last payment.
22       Q.    Are you aware of how reinstatement
23  happens in New Jersey?
24       A.    No.  I don't do reinstatements and
25  you are not paying off the loan on a reinstatement.

1    You are paying past due payments on a reinstatement.

2    I think we talking about a foreclosure action here,

3    not a reinstatement action.

4         Q.      You are right at the moment.  That

5    might not be true at some point in the future.

6         A.      I wouldn't know that.

7         Q.      Exhibit 6.  Would you agree loss

8    mitigation efforts would fall within the document

9    request?

10        A.      Well, I don't know if I have a copy

11   of the document request so I can't answer that

12   question.

13        Q.      6?

14        A.      6 is my response.

15        Q.      It has the questions under numbers.

16   Under specific responses?

17        A.      Well I suppose in number one.

18        Q.      Okay.

19             MS. ZAVATSKY:  I will object on the

20   grounds that our objections are stated.  As I said,

21   you are asking him a legal question about what may

22   or may not be a non-objectionable document to

23   produce, but he can answer if he knows.

24             THE WITNESS:  You are -- your

25   requests number one says, please produce all

```
 1   documents that refer to the defendant in any way.
 2   That is a very broad net.
 3          Q.     I agree.
 4                 Have you seen this document before?
 5          A.     Yes.
 6          Q.     When have you seen this?
 7          A.     I see this regularly.
 8                 (Whereupon Exhibit-7 was received and
 9   marked for identification.)
10                 THE WITNESS:  This is the document
11   that we discussed earlier, dated November 1, 2009
12   where the office of comptroller of currency is
13   approving Wachovia Mortgage FSB's name change
14   charter change and subsequent merger into Wells
15   Fargo Bank NA.
16          Q.     If you look at the upper left hand
17   corner, do you see where it says page 51 of 54?
18          A.     Yes.
19          Q.     Do you have any idea where the other
20   53 pages might be?
21          A.     I do not --
22                 MS. ZAVATSKY:  I'm going to object on
23   the grounds of relevance, but you can answer.
24                 THE WITNESS:  I do not know.
25                 I don't ever use this document with
```

```
 1   that up there.  When I use this document I have the
 2   original or I have a certified copy with a nice gold
 3   sticker on it.
 4        Q.      This document you produced to me in
 5   conjunction with the production of documents?
 6        A.      This is what we give in discovery a
 7   copy of it.
 8        Q.      The version with 51 of 54?
 9        A.      I don't think it's relevant to
10   anything.  Whoever made the copy, we should probably
11   get a cleaner one.
12                MS. ZAVATSKY:  Counsel can stipulate
13   that that's the copy that was in the loan for this
14   transaction so.
15        Q.      I'm asking about what the other
16   documents might be?
17        A.      I have no idea.
18                MS. ZAVATSKY:  Counsel can also
19   stipulate to what that, is if you would like.
20                MR. WINCHELL:  The other 53.
21                MS. ZAVATSKY:  I can tell you what
22   they are.
23                MR. WINCHELL:  Why do you have to
24   stipulate.  You can tell me.  I'm not going to agree
25   with you --
```

1        MS. ZAVATSKY:  They are other pages

2   from the loan file that I have produced to you.  I

3   just for the purposes of making this easier for you

4   put it in order with the other pages that look like

5   this for World Savings Bank.

6        Q.      Okay.

7                (Whereupon Exhibit-8 was received and

8   marked for identification.)

9        Q.      Mr. Dolan, have you seen the document

10  before?

11       A.      No, I have not.

12       Q.      Any reason to believe it's not a Home

13  Mortgage Foreclosure Attorney Manual?

14               MS. ZAVATSKY:  Objection.

15               THE WITNESS:  I have not seen this

16  before because it's not a document we use in San

17  Antonio.

18               MS. ZAVATSKY:  On those grounds I

19  object to any questioning along the lines of this

20  document but you can answer if you know.

21               MR. WINCHELL:  Let me take a quick

22  break and see if we have any more.

23               THE WITNESS:  Okay.

24               (Whereupon a recess was taken.)

25               MR. WINCHELL:  Back on the record.

1      Q.      Mr. Dolan, I want to go back I guess
2  this is Exhibit 5 which is the document that you
3  produced this morning.
4      A.      Yes.
5      Q.      And I noticed that the sale of the
6  loan in to the REMIC, it appears to have taken place
7  in -- is it in 2007 or 2008?
8      A.      It's 2008.
9      Q.      It's February 21, 2008?
10     A.      Yes.
11     Q.      Okay.  And this REMIC is a different
12 legal entity from World Savings Bank; is that
13 correct?
14     A.      Yes.
15     Q.      Did Wells Fargo Bank acquire that
16 legal entity?
17             MS. ZAVATSKY:  I guess I'm going to
18 object to form.  What is the question you are
19 asking?
20             MR. WINCHELL:  Did Wells Fargo Bank
21 acquire the legal entity, referring to this REMIC?
22             MS. ZAVATSKY:  Acquire the REMIC?
23             MR. WINCHELL:  Yes.
24             THE WITNESS:  They acquired the
25 certificate, the underlying certificate, they

1   acquired the obligation under the servicing and

2   pooling, you know, whatever the legal documents to

3   meet what the IRS requires.

4        Q.       The pooling and servicing agreement

5   is usually what it's called presumably, something to

6   that effect?

7        A.       So Wells Fargo acquired the

8   underlying asset which included this loan through

9   the merger.  I think technically this is its own

10  entity because it has its own IRS ID number.

11       Q.       I think they legally have to be their

12  own legal entity otherwise it doesn't work?

13       A.       I'm not a lawyer, but it makes sense

14  to me.

15            MS. ZAVATSKY:  I'm not going to

16  object, but I think that's a legal question.

17       Q.       I think we all understand that it had

18  to be another legal entity, otherwise it wouldn't

19  work as a REMIC?

20       A.       The REMIC is acting as a trustee, not

21  as the owner, because they sell the certificate to

22  the investor who is the owner.

23       Q.       So if I understood your testimony

24  correctly, the -- you understand that Wells Fargo

25  acquired the certificates which were an asset that

1   World Savings Bank owned at the time, they acquired

2   that through the merger, these certificates I mean?

3        A.      Yes, sir.

4        Q.      Do you know roughly what share of

5   Pick a Payment Loans was sold into REMIC?

6                MS. ZAVATSKY:  Objection as to

7   relevance and outside of the scope of this loan, but

8   you can answer, if you know.

9                THE WITNESS:  It was somewhere

10  between 55 and 60 percent of the loans were put into

11  a REMIC.

12       Q.      Of the Pick a Payment Loans?

13       A.      That is all World Savings originated.

14  The fixed rate loans, if any, were sold to Fannie

15  Mae immediately.  But all the Pick a Payment loans

16  were retained, that was the business model of World

17  Savings Wachovia Mortgage to originate loans retain

18  them in their portfolio.

19       Q.      I'm confused.  I think you said 55,

20  50 percent were sold into REMICs?

21       A.      Yes.  So they could used collateral

22  for home loan bank advances.

23       Q.      And from what, roughly what period

24  did World Savings initiate -- did originate Pick a

25  Payment loans?

1      A.      Pick a Payment loans were originated

2  beginning in September of 2002 and they continued

3  until October of -- September of 2008.

4      Q.      Okay.  And during that time did the

5  rate at which they were sold into REMIC's increase

6  or decrease?

7           MS. ZAVATSKY:  Same objection.  You

8  can answer.

9           THE WITNESS:  As a proportion of the

10  total REMIC's, of the total loan portfolio, it was

11  roughly the same.

12           Now as we borrowed the amount that

13  went into REMIC's was directly tied not to

14  originations, but to borrowings from the Federal

15  Home Loan Bank.

16           If the amount we borrowed went from

17  50 billion to 60 billion, I would have to have

18  another 10 or 11 billion dollars of mortgages to

19  pledge as collateral through the REMIC.

20      Q.      And what determined which loans were

21  being sold into REMIC?

22      A.      They just had to be performing at the

23  time we were looking to sell them, and if they had a

24  good payment history.

25      Q.      So you were selling all of the loans

```
 1   that were performing into REMIC's?
 2                  MS. ZAVATSKY:  Objection to form.
 3        A.       No.  We were selling those loans we
 4   would look at all the loans we had and it was
 5   random.  I need another two billion dollars worth.
 6        Q.       So it was random.  There was no
 7   criteria for decision other than they needed to be
 8   performing?
 9        A.       They had to be performing.
10        Q.       Okay.  And did World Savings acquire
11   all of the certificates from all of these REMICs?
12        A.       Yes, sir.
13                  And we were doing REMICs prior to
14   2002, in which case the adjustable rate mortgages we
15   originated were put into the REMICs.
16        Q.       Those were non-Pick a Payment
17   adjustable rate mortgages?
18        A.       That's correct.  They were non-Pick a
19   Payment originated mortgages that were originated
20   after 2002 that were also put into the REMIC.
21        Q.       Was the rate higher or lower for
22   nonadjustable rates; did that -- I will rephrase.
23                  Is the rate of sale of loans in to
24   REMICs higher for Pick a Payments or higher for
25   adjustable, for the non-Pick a Payment adjustable
```

1  rate?

2        A.      Well, that it depends on the year

3  because the nonadjustable rate, non-Pick a Payment

4  loans, there weren't that many originated as a

5  percent of the total loans say in 2007 as in 2001

6  all of our production was non-Pick a Payment loans.

7        Q.      Understood that.

8              Within the subset of non-Pick a

9  Payment adjustable rate loans, what percentage was

10 sold into REMICs?

11             MS. ZAVATSKY:  Objection.

12             THE WITNESS:  I --

13             MS. ZAVATSKY:  That is way outside

14 the scope.

15             THE WITNESS:  I don't know the

16 exact -- what it was is any adjustable rate loan,

17 whether it was a Pick a Payment or non-Pick a

18 Payment was eligible to be placed in to the REMIC

19 through the same criteria.

20       Q.      Okay.  And when we are talking about

21 non-Pick a Payment adjustable rate loans, all of

22 those REMICs were REMICs that issued certificates

23 only to World Savings Bank?

24       A.      That is correct.

25       Q.      So every REMIC that World Savings

```
 1   Bank had any affiliation with they acquired all of
 2   the certificates?
 3          A.      Yes.
 4                  MR. WINCHELL:  I think I am done with
 5   questions, unless you want to add anything.
 6                  MS. ZAVATSKY:  I don't think I have
 7   anything for this witness at this time.
 8                  MR. WINCHELL:  Okay.  Obviously we
 9   have some document requests on the record.
10                  MS. ZAVATSKY:  Would it be possible
11   for you to put them in writing and send them to me.
12                  MR. WINCHELL:  They are already in
13   writing.  The only one about which I did not know is
14   the organizational documents, all the documents with
15   respect to those REMIC because I didn't know about
16   this REMIC --
17                  MS. ZAVATSKY:  Yes.
18                  MR. WINCHELL:  The notes about the
19   loan, we don't have any notes about this loan as far
20   as I can tell other than just loan history.  We
21   don't have any of the internal notes and we want all
22   of those with respect to loss mitigation or anything
23   else but particularly with respect to loss
24   mitigation.
25                  MS. ZAVATSKY:  What I'm saying is it
```

1    may take us sometime to get the transcript back so

2    if you can send me an e-mail or letter or something

3    that says these are the categories of documents that

4    I think are still outstanding, I can address that.

5                     MR. WINCHELL:   That's fine.

6                     With that we are going to keep the

7    deposition open because we have the document

8    request, to the extent we have to ask anything

9    further, but we are adjourned for the moment.   All

10   right.

11

12                    (Whereupon proceeding adjourned.

13   Time noted:   11:49 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE


     I, GERALDINE ADINOLFI, a Certified Court
Reporter and Notary Public of the State of New
Jersey, do hereby certify that the witness was duly
sworn by me.
     I FURTHER CERTIFY that the foregoing is a
true and accurate transcript of the testimony as
taken stenographically by and before me at the time,
place and on the date hereinbefore set forth.
     I FURTHER CERTIFY that I am neither a
relative nor employee nor attorney nor counsel of
any of the parties in this action and that I am
neither a relative nor employee of such attorney or
counsel, and that I am not financially interested in
the action.


_____
Certified Court Reporter
License No. 30XI00228000

Notary Public of the State of New Jersey
Notary No.  2273630
My Commission expires:  March 30, 2016
Dated:  May 29, 2014